PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JAMES HEIKO,

*Plaintiff-Appellant,*

v.

COLOMBO SAVINGS BANK, F.S.B.,

*Defendant-Appellee.*

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Amicus Supporting Appellant.*

No. 04-2046

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Roger W. Titus, District Judge.
(CA-03-1122-RWT)

Argued: October 25, 2005

Decided: January 10, 2006

Before WILKINS, Chief Judge, and WILKINSON
and GREGORY, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Wilkins and Judge Gregory joined.

## COUNSEL

**ARGUED:** Stephen Zak Chertkof, HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN, P.L.L.C., Washington, D.C., for

Appellant. Barbara L. Sloan, EQUAL EMPLOYMENT OPPORTU-
NITY COMMISSION, Washington, D.C., for Amicus Curiae. Kath-
erine Kristin Brewer, SCHMELTZER, APTAKER & SHEPARD,
P.C., Washington, D.C., for Appellee. **ON BRIEF:** Douglas B.
Huron, Tammany M. Kramer, HELLER, HURON, CHERTKOF,
LERNER, SIMON & SALZMAN, P.L.L.C., Washington, D.C., for
Appellant. Gary L. Lieber, Anessa Abrams, SCHMELTZER,
APTAKER & SHEPARD, P.C., Washington, D.C., for Appellee. Eric
S. Dreiband, General Counsel, Lorraine C. Davis, Acting Associate
General Counsel, Vincent J. Blackwood, Assistant General Counsel,
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Wash-
ington, D.C., for Amicus Curiae.

---

## OPINION

WILKINSON, Circuit Judge:

James Heiko brings suit against his former employer, Colombo
Savings Bank, alleging a failure to promote and constructive dis-
charge on the basis of disability. At the time of the alleged discrimi-
nation, Heiko suffered from end-stage renal disease — near complete
kidney failure — and spent three afternoons per week, for a total of
twelve hours, attached to a dialysis machine that removed fatal toxins
from his blood. The district court granted summary judgment for
Colombo, holding that Heiko was not disabled under the Americans
with Disabilities Act (ADA) because the elimination of bodily waste
is not a "major life activity." *See* 42 U.S.C. § 12102(2)(A) (2000). It
also held in the alternative that even if Heiko was disabled, he had not
proffered facts sufficient to support a finding of discrimination.

We hold that elimination of bodily waste is a "major life activity"
within the meaning of the ADA. With respect to the allegations of
discrimination, summary judgment was improper on the claim of fail-
ure to promote, because Heiko has presented a strong prima facie case
of disability discrimination and considerable evidence of job qualifi-
cations superior to those of the person selected in his stead. Summary
judgment was proper, however, on the allegation of constructive dis-
charge. We therefore affirm in part, reverse in part, and remand for
further proceedings.

## I.

In January 1998, James Heiko commenced employment with Colombo Savings Bank as a Loan Assistant in the Loan Administration Department. Colombo is a small commercial bank in Maryland that employs approximately thirty people. Prior to joining Colombo, Heiko had received his undergraduate degree in mathematics in 1994. He had worked in the banking industry since 1990, most recently as a research representative with the Chase Manhattan Bank.

Heiko moved quickly through the ranks at Colombo. In April 1999, the bank's President and CEO, John Lane, approved Heiko's promotion to Senior Operations Officer/Table-Funded Loan (TFL) Supervisor. With Lane's approval, Heiko was again promoted in June 1999, this time to Assistant Vice President of Loan Administration. In this new capacity, Heiko handled a wide range of commercial lending responsibilities, including reviewing escrow analyses, monitoring commercial loans, and preparing reports and audits. He also assumed some supervisory authority over various lower-level employees in Loan Administration.

Heiko had a variety of other duties at Colombo. Throughout the course of his tenure at the bank, he was often asked to tackle problems outside the Loan Administration Department. Among other things, he was responsible for creating a loan tracking device and a weekly loan report. He also participated in meetings on banking matters unrelated to his primary duties. Heiko received favorable performance evaluations, and in December 2000 Lane named him Employee of the Year at a bank holiday function.

Heiko had polycystic kidney disease when he joined Colombo. Several months after his promotion to Assistant Vice President, his condition deteriorated and he was diagnosed with end-stage renal disease. This disease renders the kidneys virtually inoperative. In a normal human body, the kidneys filter from the blood dangerous toxins that naturally build up over time, allowing these toxins to exit the body during urination. To avoid toxic waste buildup, and death within several months, end-stage renal disease must be treated with either a kidney transplant or dialysis.

Heiko began hemodialysis in November 1999. In this procedure, Heiko's blood was pumped through a dialysis machine, which purged the toxins and returned the cleansed blood to his body. Heiko attached to the dialysis machine by inserting a needle into a fistula located in his arm. A fistula is a surgically-constructed connection between an artery and vein, designed to withstand frequent needle insertions and augment blood flow.

Heiko's dialysis regimen required a substantial amount of time and forced him to rearrange his work schedule. He underwent dialysis three afternoons each week for four hours each day. To keep up a forty-hour work week, Heiko had to maintain irregular hours, working from 7:00 a.m. to 2:00 p.m. on the days he received dialysis.

Heiko's dialysis treatment caused him significant discomfort. According to Heiko, dialysis was "like having a part-time job." Being attached to a dialysis machine was constricting, and often caused pain and swelling in his arm, where the needle attached to his fistula. After dialysis, he immediately went home to rest and felt exhausted for the remainder of the evening. He was usually able to take only baths because standing in the shower was too difficult. In the following mornings he would often feel the urge to vomit, and would frequently remain nauseous well into that day. Dialysis also necessitated changes to his diet, such as limitations on potassium intake, occasional fasting, and a reduction in fluid consumption. Heiko was once hospitalized for low potassium levels and had one of his kidneys removed in 2000. He also had several surgeries to build and repair his fistula.

After Heiko had begun dialysis, Heather Brown, Colombo's Vice President of Loan Administration and Heiko's immediate supervisor, began preparing to leave Colombo. Heiko was interested in her position, and discussed his desire for a promotion with Brown and Lane. In March 2001, however, Lane awarded the Vice President position to Sandy Rubin on Brown's recommendation. Brown had considered only Rubin and Heiko for the position, but had not conducted interviews.

Prior to her promotion to Vice President, Rubin had been employed with Colombo for approximately eighteen months and had served as the head of Colombo's Mortgage Operations Department. She did not

have a college degree, but had worked in banking since the mid-1970s. The Mortgage Operations Department handled mortgage loans and was initially distinct from Loan Administration, which was primarily concerned with commercial loans. Mortgage Operations was eventually subsumed into Loan Administration and Brown became Rubin's supervisor. Rubin was not, however, familiar with certain types of management reports or with several of the computer programs utilized in the Loan Administration Department. After her promotion to Vice President, Heiko assisted in training her on various software applications and spreadsheet functions.

Upon learning that Rubin had received the promotion, Heiko approached both Lane and Brown to determine why he had not been named Vice President. According to Heiko, Lane referred to the number of hours the Vice President would need to work and noted that if Heiko was to receive a kidney transplant, he would have to be out of the office for four to six months. Heiko contends that he had informed Lane on numerous occasions that a kidney transplant would only require a six-week absence. When Heiko confronted Brown about Rubin's promotion, she replied: "Look at your situation."

Heiko warned Lane that promoting Rubin was a mistake and informed various Colombo officers that he would not work under her. Lane asked Heiko if he would, in addition to some of his current responsibilities, be interested in taking over Rubin's former responsibility managing the Mortgage Operations Department, which was apparently in disarray. Heiko declined this lateral move.

In July 2001, Heiko instead transferred to the Loan Processing Department and began work as a loan processor. This move resulted in the loss of his Assistant Vice President title and his previous responsibilities, but not a diminution in his salary. Heiko was aware that he would no longer be considered an Assistant Vice President once he joined Loan Processing. On July 13, 2001, he was informed that he would not receive an annual pay raise.

Soon after, Heiko complained to several Colombo officers that the bank was discriminating against him on the basis of his kidney failure by not promoting him and later reducing his responsibilities. He also relayed this complaint to Lane, and they discussed the matter. Around

the same time, Heiko informed Colombo that he had been searching for new employment.

In early August of 2001, Lane informed Heiko that the Loan Processing Department was overstaffed and that the only available position was as his executive assistant. Heiko accepted this position. Lane also told Heiko that he would not be needed before 7:30 a.m. This impacted Heiko's total hours, because he still had to leave early for dialysis every other day. After several weeks as an executive assistant, Lane asked Heiko to move back to Loan Administration because a Loan Assistant position had become available. This was the position Heiko had occupied when he first joined Colombo.

Heiko resigned from Colombo in October 2001, after accepting employment elsewhere. In June 2003, he received a kidney transplant and does not now require dialysis. Sandy Rubin, meanwhile, did not fare well as the Vice President of Loan Administration. In January 2002, Lane demoted Rubin to her former position and cut her salary. She resigned in February 2002 after Colombo decided to terminate her employment.

Heiko filed suit against Colombo in state court in March 2003 alleging discrimination on the basis of his kidney failure, in violation of Article 1, § 27-19 of the Montgomery County Code (2004). The parties agreed that § 27-19 was to be interpreted consistent with the federal ADA. As relevant here, Heiko contended that he was covered under the definition of "disability" set forth in the ADA because his end-stage renal disease rendered him "substantially limit[ed]" in the "major life activit[y]" of eliminating bodily waste. *See* 42 U.S.C. § 12102(2)(A). Colombo removed the suit to federal court on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1441 (2000).

The district court granted summary judgment for Colombo. It held that waste elimination was not a major life activity, and that Heiko was therefore not disabled. It also held that even if he had a disability, Heiko had not set forth facts sufficient to permit findings of discriminatory failure to promote or constructive discharge. Heiko appeals.

## II.

The threshold question before us is whether Heiko is disabled within the meaning of the ADA. A court may resolve this issue as a

matter of law. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) (involving the parallel provisions of the Rehabilitation Act, 29 U.S.C. § 701 et seq. (2000)). While Heiko has brought this suit under the Montgomery County Code, the relevant definition of "disability" in this municipal code is virtually identical to the ADA's definition of the term. *Compare* Montgomery County, Md., Code art. 1, § 27-6(c) *with* 42 U.S.C. § 12102(2). The parties agree that the Montgomery County Code tracks the ADA in all relevant respects, and we accordingly analyze this case under that federal statute. *See also Cohen v. Montgomery County Dep't of Health & Human Servs.*, 817 A.2d 915, 922-25 (Md. Ct. Spec. App. 2003) (interpreting the disability discrimination provisions in the Montgomery County Code as congruent with the ADA).

The ADA provides that an individual has a disability if, inter alia, he suffers from "a physical or mental impairment that substantially limits one or more of [his] major life activities." 42 U.S.C. § 12102(2)(A). Heiko is thus required to make a three-part showing. He must prove (1) that he has a physical or mental impairment, (2) that this impairment implicates at least one major life activity, and (3) that the limitation is substantial. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194-95 (2002); *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 467 (4th Cir. 2002). The parties agree that Heiko's end-stage renal disease constitutes a physical impairment. We thus proceed to the major life activity and substantial limitation questions.

A.

The ADA does not define the term "major life activities." *Torcasio v. Murray*, 57 F.3d 1340, 1353 (4th Cir. 1995). The Supreme Court has, however, explained that "'[m]ajor' in the phrase 'major life activities' means important." *Toyota Motor Mfg.*, 534 U.S. at 197. An activity may lack a "public" or "economic" dimension and still be considered important. *Bragdon*, 524 U.S. at 638. We have therefore concluded that "[t]he term 'major life activities' refers to 'those activities that are of central importance to daily life,'" *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 274 (4th Cir. 2004) (quoting *Toyota Motor Mfg.*, 534 U.S. at 197) and "that the average person in

the general population can perform with little or no difficulty," *id.* (internal quotation marks omitted).

Heiko contends that his kidney failure severely impacted his ability to eliminate bodily waste. Under the framework presented above, we conclude that waste elimination qualifies as a major life activity. The elimination of bodily waste is basic to any person's daily regimen. It is also a daily activity that the average person can accomplish with little effort, *see Rohan*, 375 F.3d at 274, by urinating several times a day. The elimination of bodily waste is, moreover, not only "of central importance to daily life," *Toyota Motor Mfg.*, 534 U.S. at 197, but of life-sustaining importance. Without it, hazardous toxins would remain in the body and eventually become fatal. For all of these reasons, waste elimination also fits comfortably within the Equal Employment Opportunity Commission's (EEOC) non-exhaustive list of major life activities, which includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2004).[1]

It is therefore not surprising that every circuit court to address the issue has concluded that waste elimination is a major life activity. For example, in *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 380 (3d Cir. 2004), the plaintiff suffered from end-stage renal disease and received dialysis treatment. The Third Circuit concluded that "processing and eliminating waste from the blood qualifies as a major life activity because, in their absence, death results." *Id.* at 384; *see Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 785 (8th Cir. 2004) (holding that plaintiff who underwent dialysis was "incapable of doing activities of central importance to a person's life, such as cleansing one's own blood cells"); *see also Gilbert v. Frank*, 949 F.2d 637, 641 (2d Cir. 1991) (noting that "persons whose kidneys . . . do not function sufficiently to rid their bodies of waste matter without

---

[1]The degree of deference, if any, that is due to the EEOC's regulations remains an open question. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563 n.10 (1999); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 480 (1999). Because the parties agree that the regulations are instructive, we look to the regulations for general guidance and express no opinion on the appropriate level of deference they may be due. *See Pollard*, 281 F.3d at 468 n.2.

regular dialysis" may be "substantially limited in their ability to care for themselves").

The district court reasoned, however, that waste elimination was not a major life activity because it was merely a characteristic of Heiko's kidney failure. This was not correct. The *impairment* in this case is Heiko's kidney failure. The *effect* of this impairment is an inability to eliminate waste naturally. *See also Fiscus*, 385 F.3d at 382 ("Absence of kidney function [is] the impairment; the consequence [is] the impact on the activity of blood cleansing and body waste processing. Thus it was incorrect for the District Court to conflate the two.").[2]

Were the district court correct, the ADA would not cover major life activities that are closely linked with serious disabilities. For example, the Supreme Court in *Toyota* explicitly noted that "major life activities" is "a category that includes such basic abilities as walking, seeing, and hearing." 534 U.S. at 197. But an inability to see could of course be recast as a characteristic of blindness, and an inability to hear could likewise be reframed as a feature of deafness. *See also* 29 C.F.R. § 1630.2(i) ("major life activities" include seeing and hearing). Waste elimination thus cannot be a mere "characteristic" of end-stage renal disease for the purposes of the ADA.

This does not mean, however, that every example of organ failure will be equated with a major life activity. In this case, kidney failure is a physical impairment with a direct effect on waste elimination, an activity of critical importance that the average individual can easily perform. *See Rohan*, 375 F.3d at 274. We have no occasion to consider whether the malfunction of other organs would have a similar

---

[2]Colombo's reliance on *Furnish v. SVI Systems, Inc.*, 270 F.3d 445 (7th Cir. 2001), is therefore misplaced. In *Furnish*, a plaintiff with Hepatitis B brought suit under the sole theory that he was substantially limited in the major life activity of "liver function." *Id.* at 450. In rejecting this argument, the Seventh Circuit noted that the plaintiff might have succeeded had he tied his impairment to a valid major life activity. *Id.* In this case, Heiko has done precisely that, and is not contending that "kidney function" is a major life activity. *See also Fiscus*, 385 F.3d at 385 (distinguishing *Furnish* on identical grounds).

effect on a major life activity. *See Fiscus*, 385 F.3d at 383 ("[M]ajor life activities are conceptually distinct from the physical impairments that give[ ] rise to them."). Such questions are simply not before us.

Nor do we accept Colombo's contention that recognizing waste elimination as a major life activity would effectively read out the separate statutory requirement that a plaintiff prove he is substantially limited. To be sure, recognition of a major life activity gives rise to the implication that certain impairments are by their very nature substantially limiting: the major life activity of seeing, for example, is always substantially limited by blindness. *See, e.g.*, *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 166 n.5 (4th Cir. 1997) (en banc) (plurality) ("[W]e recognize that some conditions will always constitute impairments that substantially limit the major life activities of the afflicted individual.") *abrogated on other grounds*, *Bragdon*, 524 U.S. at 631. It would be ironic, to say the least, if the existence of such severe conditions prevented us from recognizing the major life activities they impair. Nevertheless, the substantiality inquiry remains analytically separate from the identification of a major life activity. As we demonstrate below, whether a person is substantially limited is a distinct and individualized inquiry that must consider not only a particular plaintiff's limitations, but also the effects of corrective mitigation measures. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83 (1999); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 n.10 (4th Cir. 1997). Not every impairment of sight is a substantial limitation, *see Sutton*, 527 U.S. at 488-89, and there is little reason to think that every instance of kidney disease will constitute a substantial limitation either.

## B.

We thus turn to whether Heiko's kidney failure "substantially limit[ed]" his ability to eliminate waste. 42 U.S.C. § 12102(2)(A). The statutory term "substantially" means "considerable or to a large degree." *Toyota Motor Mfg.*, 534 U.S. at 196 (internal quotation marks omitted). This definition precludes coverage of impairments whose effects on a major life activity rise only to the level of a "mere difference" with the abilities of an average individual. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999); *see also EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352-53 (4th Cir. 2001) (no substantial limi-

tation in major life activity of sleeping where plaintiff did not experience a greater lack of sleep than the average individual). As we have explained, "[t]he phrase 'substantially limits' sets a threshold that excludes minor impairments from coverage under the ADA." *Id.* at 352.

Among the factors courts should consider in making the substantial limitation determination are the impairment's "nature and severity" and "expected duration." 29 C.F.R. § 1630.2(j)(2)(i)-(ii); *see also Pollard*, 281 F.3d at 467-68 (same). The impairment must, for example, be "permanent or long term." *Toyota Motor Mfg.*, 534 U.S. at 198. Sporadic or otherwise temporary impairments do not qualify as substantial limitations. *See Rohan*, 375 F.3d at 276; *Pollard*, 281 F.3d at 468.

Whether Heiko is substantially limited in a major life activity is thus determined by examining the unique facts and circumstances surrounding his particular impairment. *See Toyota Motor Mfg.*, 534 U.S. at 198; *Sutton*, 527 U.S. at 483; *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995). We conduct this inquiry by assessing the impairment in combination with any positive or negative effects from mitigation measures. *See Sutton*, 527 U.S. at 482.

Reviewing Heiko's end-stage renal disease and dialysis under this individualized framework, we conclude that Heiko was substantially limited in his ability to eliminate waste. Indeed, no reasonable jury could conclude otherwise. In order to accomplish the equivalent of urination, Heiko had to insert a needle into his surgically-fashioned fistula and tether himself to a dialysis machine three afternoons per week, for a total of twelve hours. This did not include travel time to and from the dialysis center, or the time required to set up the dialysis equipment. Dialysis also unyieldingly set the terms of his daily schedule. While he was able to work a forty-hour week, his condition required him to arrive at work by 7:00 a.m. every other day. And whereas urination does not have side effects, after dialysis Heiko felt nauseous and depleted, unable even to stand in the shower. These aspects of his renal failure and concomitant treatment dramatically "distinguish [him] from the general population" in the major life activity of waste elimination. *Rohan*, 375 F.3d at 275. And while dialysis did of course enable Heiko to eliminate waste, the ADA "ad-

dresses substantial limitations on major life activities, not utter inabilities." *Bragdon*, 524 U.S. at 641.

Heiko's impairment was also neither fleeting or temporary, *Rohan*, 375 F.3d at 276, as he dealt with dialysis and its unfortunate effects each day. The prospect of a kidney transplant was speculative at best — Heiko waited on a transplant list for over two years, and only received a new kidney after nearly four years of dialysis. Crucially, at all times relevant to this case, he labored under the uncompromising limitations we have just described. For all of these reasons, Heiko's impairment and mitigation measures rise to the level of severity that the substantial limitation requirement demands. *See* 29 C.F.R. § 1630.2(j)(2)(i).[3]

## C.

In sum, plaintiff's end-stage renal disease is his physical impairment, the elimination of waste is the major life activity that is limited, and the limitation was a substantial one because Heiko was required to spend at least four hours, three days a week undergoing dialysis in order to remove waste from his body. Considering Heiko's circumstances through any broader lens on disability only reconfirms a close textual analysis under the statute. We can hardly believe that Congress wished to leave outside the purview of the ADA an individual determined to surmount a real disability and make a constructive contribution to the workplace. The ADA was designed to protect the "truly disabled, but genuinely capable." *See Halperin*, 128 F.3d at 200. In short, Heiko seems just the sort of person for whom the ADA was intended. Viewed from the perspective of the forest or the trees, the Act's coverage of him is apparent.

---

[3]We express no view on whether other plaintiffs with end-stage renal disease will be substantially limited in a major life activity. Like all others claiming an impairment under the Act, they must prove "the extent of the limitation in terms of their own experience." *Albertson's*, 527 U.S. at 567. Whether a plaintiff is substantially limited is a case-by-case determination, *Sara Lee Corp.*, 237 F.3d at 352, and we therefore have no occasion to consider whether individuals who require less time-consuming dialysis treatment or exhibit fewer adverse side effects will be disabled under the ADA.

III.

We next address the district court's grant of summary judgment to Colombo on Heiko's failure to promote and constructive discharge claims. We conclude that summary judgment was improper on the claim of failure to promote, which presents a jury question. As to Heiko's constructive discharge contention, the district court properly awarded summary judgment to the employer.

A.

Heiko first alleges that Colombo did not promote him to Vice President of Loan Administration because of his end-stage renal disease. Colombo contends that it promoted Sandy Rubin instead of Heiko due to her superior qualifications. Because Colombo disclaims any suggestion that its decision was founded on Heiko's disability, this case is properly analyzed under the familiar framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *See Halperin*, 128 F.3d at 196 n.6; *Ennis*, 53 F.3d at 57-58; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003) (noting that courts use the *McDonnell Douglas* methodology for ADA disparate-treatment claims).[4]

Under *McDonnell Douglas*, the plaintiff must first make out a prima facie case of discrimination. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). If he does so successfully, the burden then shifts to the defendant to provide a legitimate, non-discriminatory explanation for its decision. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). Once such a neutral reason is proffered, the burden reverts to the plaintiff

---

[4]Colombo does not contend that promoting an individual who was required to leave the office three afternoons per week was an accommodation that "would impose an undue hardship" on its operations. 42 U.S.C. § 12112(b)(5)(A); *see also* Montgomery County, Md., Code art. 1, § 27-6(bb). We therefore express no opinion on whether small businesses like Colombo, whose enterprise requires interaction with customers and supervision of employees during normal business hours, are required to accommodate disabilities in such a fashion.

to establish that the employer's non-discriminatory rationale is a pretext for intentional discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). At this point, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148; *see also Anderson*, 406 F.3d at 269.

B.

There can be no doubt in this case that Heiko has established at least a prima facie inference of discrimination, and that Colombo has successfully rebutted it by responding that it selected Rubin over Heiko due to her superior qualifications. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("[R]elative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."). We thus turn to the crux of the matter — whether there is sufficient evidence of pretext. *Reeves*, 530 U.S. at 143. A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons. *See Anderson*, 406 F.3d at 269; *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648-49 & n.4 (4th Cir. 2002).

In conducting this analysis, we are mindful that we assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question. *See Anderson*, 406 F.3d at 269 (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997) and *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995)). Here, Colombo focused primarily on banking skills and experience. In a job description of the Vice President position, Colombo listed as the relevant job specifications computer literacy and "[l]oan managerial servicing/administration experience in a banking atmosphere." Heather Brown testified that there was no "specific formula" she used to evaluate candidates, but that banking experience and how much training the candidate would require were primary considerations.

Construing the facts in favor of Heiko, as we must, we conclude that a reasonable factfinder could determine that Colombo's explana-

tion for its promotion decision is "unworthy of credence." *Burdine*, 450 U.S. at 256. Heiko was climbing his way toward the upper rungs of Loan Administration when his kidney condition declined and he began extensive dialysis treatment. He was then denied a promotion. Heiko has satisfied his burden under *McDonnell Douglas* because in light of Colombo's proffered job criteria, a reasonable jury could conclude — on the basis of Heiko's greater familiarity with various aspects of commercial lending, his superior mastery of the relevant computer programs used in the Loan Administration Department, his quick succession of promotions, and his performance evaluations — that Colombo's contention that he was less qualified than Rubin is not to be believed. We address each in turn.

First, a reasonable factfinder could determine that by the time of Rubin's promotion, Heiko had comparatively greater experience with both the Loan Administration Department and commercial lending, one of the primary banking areas handled by that department. Heiko had been employed with Colombo for over three years, all in Loan Administration. His duties as Senior Operations Officer/TFL Supervisor and Assistant Vice President of Loan Administration both required intimate knowledge of commercial lending practices and procedures. Nor was Heiko unacquainted with mortgage lending, as illustrated by the fact that he was asked to manage the Mortgage Operations Department after Rubin was promoted.

Rubin, by contrast, had worked in the banking industry since the mid-1970s, but her speciality was mortgage loans. She had only started with Colombo in August 1999, a year and a half before her eventual promotion to Vice President. Colombo does not dispute that she initially reported to Heiko when she first joined the bank. While Rubin's Mortgage Operations Department was merged under Loan Administration before she was promoted to Vice President, her main responsibilities continued to concern mortgage lending. According to Heiko, Rubin informed him that she had not dealt with commercial loan documents recently in her career. President Lane himself noted that Rubin needed to enhance her understanding of commercial lending practices. And as of her 2000 performance evaluation, one of her "principal weaknesses" was that she was still in the process of learning "the bank's philosophy." She was not, for example, familiar with several of Loan Administration's management reports. Heiko was.

Second, Rubin's lack of knowledge about the inner workings of Loan Administration was made evident in her comparative unfamiliarity with the computer programs critical to that department. In a job description for the Vice President position, Colombo listed the following as the first job specification: "Must be computer literate. Must have spreadsheet and word processing experience." Heather Brown expressly acknowledged that Heiko had computer skills that outmatched Rubin's. He had taken undergraduate courses in computer science, was versatile in numerous software programs, and had used advanced software applications in a variety of special projects, such as his creation of a loan tracking device. He was also familiar with predecessor versions of the bank's data processing system. Rubin had no such experience, and Colombo does not dispute that upon Rubin's promotion to Vice President, both Heiko and Brown had to train her on spreadsheet software. While Colombo presently appears to suggest that computer experience was not a relevant criterion for selecting a Vice President, a jury could certainly conclude otherwise in light of the fact that it was listed as the first job specification for the position. *See Dennis*, 290 F.3d at 646-47 (pretext may be inferred from employer's reliance on criteria that are different from those contained in written job qualifications).

Third, Heiko was on the rise at Colombo. His success at the bank translated into a swift series of promotions prior to the time when he began dialysis. A little over a year after he started in Loan Administration, he was elevated to Senior Operations Officer/TFL Supervisor, a position that required a wide range of customer service and computer skills, as well as "[w]orking knowledge of the financial institution's commercial and consumer lending procedures." Several months later, in June 1999, John Lane named him Assistant Vice President of Loan Administration. Lane announced the promotion in a congratulatory memorandum circulated to the entire bank, writing that Heiko "has shown outstanding leadership and knows how to be a team player." Heather Brown had recommended Heiko for this promotion in part because of his "positive attitude." In his new capacity as Assistant Vice President, Heiko assumed an even greater number of responsibilities, including supervising various employees in Loan Administration. In July 1999, Heather Brown recommended him for a five percent pay increase, noting that Heiko was "responsible for day-to-day operations" in Loan Administration, and that he was a

"very hard working individual" who was "loyal and supportive of Colombo."

Lastly, Heiko's performance evaluations illustrate his professional momentum, and provide another critical point of comparison with Sandy Rubin. In 1999, Rubin was given a 53 out of 60, and Heather Brown rated Heiko a 44 out of 60. Brown did note, however, that "Jim is a very organized individual who is willing to help others achieve their goals," and that he had undertaken several projects outside of his normal job responsibilities. By 2000, Colombo's assessment of the two had changed. In that year, Brown gave Heiko a 53 of 60, writing that he was a "team player" whose customer service had improved. She also recommended that he be given further managerial training and more supervisory responsibility. Rubin, by comparison, was given a 50 out of 60, and her evaluator wrote that her "weakness-[es] would be a continual learning process of the bank's philosophy and knowledge of overall banking."

While Colombo does point to areas in Heiko's performance evaluations suggesting that he could improve his interpersonal skills, there is ample evidence pointing in precisely the opposite direction. Brown, for example, testified that Heiko's interpersonal skills had improved since his 2000 performance evaluation. Heiko was also named Employee of the Year in December 2000. Though Colombo contends that it gave Heiko this award for "humanitarian" reasons, a jury could certainly believe that bestowing such an award at a company-wide gathering to an employee moving his way up the corporate ladder was not solely a token gesture.

Colombo's primary defense of its promotion decision is that Rubin was chosen because she had greater management expertise due to her previous jobs at other banks and her role in the Mortgage Operations Department. But this does not "conclusively reveal[ ] some other, nondiscriminatory reason for [Colombo's] decision." *Reeves*, 530 U.S. at 148. In his capacity as Assistant Vice President, Heiko did supervise several employees in Loan Administration, and Heather Brown specifically recommended in his 2000 performance evaluation that he be given greater managerial responsibility. In addition, when Rubin was promoted to Vice President, Lane specifically asked Heiko if he would head up the Mortgage Operations Department, the depart-

ment that Rubin formerly led. And while Rubin may have had more years of management experience than Heiko, Colombo does not dispute that the department Rubin had recently overseen was in need of a major turn-around. Nor is it clear how Rubin's management experience made her a stronger candidate when as of her 2000 employment evaluation, one of her main weaknesses was a lack of "knowledge of overall banking."

In short, a reasonable factfinder could conclude that Heiko was poised for the Vice President position and displayed aptitude for his chosen profession. He began dialysis shortly after becoming an Assistant Vice President, and was thereafter denied a promotion, which was instead given to a fellow employee who lacked many of his qualifications. We therefore conclude that Heiko has made a sufficient showing that Colombo's explanation for its promotion decision was pretextual. While no single factor is dispositive, taken in combination they suggest that Heiko was discernibly better qualified than Rubin. When a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer. *See Dennis*, 290 F.3d at 649 n.4; *Evans*, 80 F.3d at 960. But where, as here, the plaintiff has made a strong showing that his qualifications are demonstrably superior, he has provided sufficient evidence that the employer's explanation may be pretext for discrimination. *Anderson*, 406 F.3d at 269.[5]

---

[5]Heiko also points to various statements by Colombo officers that he argues may be probative of discriminatory bias. For example, Lane allegedly made a reference to the time Heiko would need to be out for a kidney transplant, and Brown said "Look at your situation" when he asked why Rubin was promoted. Because we conclude that Heiko's prima facie case and his evidence of superior qualifications fairly rebut Colombo's asserted non-discriminatory rationale, *Reeves*, 530 U.S. at 148-49, it is unnecessary for us to address these various remarks, some of which are rather opaque. We note, however, that a jury could find them relevant in its determination of whether Colombo in fact discriminated against Heiko on the basis of his disability. *See id.* at 152.

IV.

We now turn to Heiko's constructive discharge claim. Heiko contends that he was forced to leave Colombo because the bank reduced his responsibilities and made his workday unbearable. To prove constructive discharge, a plaintiff must at the outset show that his employer "deliberately made [his] working conditions intolerable in an effort to induce [him] to quit." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001) (internal quotation marks omitted). Plaintiff must therefore demonstrate: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186-87 (4th Cir. 2004); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997). An employer's actions are deliberate only if they "were intended by the employer as an effort to force the plaintiff to quit." *Matvia*, 259 F.3d at 272. Whether an employment environment is intolerable is determined from the objective perspective of a reasonable person. *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). "However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (internal quotation marks and alterations omitted).

On the record before us, Heiko has not shown a deliberate intent on the part of Colombo to force him to leave. *See Honor*, 383 F.3d at 187. In fact, it was Heiko himself who initiated the events that ultimately led to his departure. Upon Rubin's promotion to Vice President, Heiko told Lane that Rubin's selection was a mistake and announced that he would not work under her. Heiko was then offered a lateral transfer to a position in the Mortgage Operations Department, which he also refused. Instead, with full awareness that he would lose his Assistant Vice President title and his Loan Administration responsibilities, he chose to relocate to the Loan Processing Department. Colombo allowed him to do this even though he had relatively less experience with loan approval, this department's primary responsibility. Colombo also later made room for him in several different positions.

While Heiko was progressively asked to undertake tasks more menial than those to which he was accustomed, he does not contend that such duties were inappropriate for someone who did not occupy an Assistant Vice President position. And though he did not receive an annual raise, he does not suggest that the salary he received was incommensurate with his reduced responsibilities at that time.

Far from revealing that the bank deliberately intended to force him to leave, Colombo's actions squarely indicate that it exercised commendable patience with an employee who was frustrated, perhaps justifiably, over not receiving a promotion. And while Heiko suggests that the bank could have adopted a restructuring proposal that might have created a new position for him, it surely cannot be the case that deliberateness may be proven by an otherwise benign business decision concerning internal corporate configuration.

Even if Heiko could prove that Colombo deliberately intended to force him out, he still cannot show that the work environment at the bank was objectively intolerable. *See Munday*, 126 F.3d at 244. That Heiko was not made Vice President is hardly conclusive, because "the denial of a single promotional opportunity is insufficient to create an intolerable working environment." *Taylor v. Va. Union Univ.*, 193 F.3d 219, 237-38 (4th Cir. 1999) (en banc) *abrogated on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). And Heiko does not suggest that the bank objected to the unconventional schedule he was required to maintain in order to undergo dialysis. To be sure, his schedule was altered by a half-hour when he briefly worked as Lane's executive assistant, but Lane recommended that he return to Loan Administration in part because it would afford him more flexibility. Furthermore, while comments coworkers made that Heiko was only working "half days" may reveal an insensitivity to his disability, they do not nearly rise to the level of intolerability. "[D]ifficult or unpleasant working conditions" do not qualify as intolerable conditions, *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994), nor are employees "guaranteed a working environment free of stress," *Honor*, 383 F.3d at 187 n.2 (internal quotation marks omitted).

V.

The Americans with Disabilities Act and parallel state and local statutes reflect our national commitment that disabled persons should

lead lives that, to the extent possible, are unencumbered by the disabilities that have befallen them. An individual's impairment should not operate to restrain his professional aspirations when in spite of his limitations, he has dedicated himself to his craft and sought advancement in his field. In the face of formidable obstacles, plaintiff persisted in his desire to develop his banking skills. While the ADA protects only a limited segment of our population, James Heiko fits clearly within its bounds. And though Colombo at times appears to have been appreciative of Heiko's work, there is sufficient evidence for a jury to conclude that its denial of a promotion was made on a prohibited basis. Accordingly, the judgment is therefore

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*