**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1994**

ROBERT LOUIS GARY,

                Plaintiff − Appellant,

      and

ROBERT BARON DUFFY,

                Plaintiff,

      v.

FACEBOOK, INC.; WAYNE HAWKINS,

                Defendant – Appellees,

      and

JAMES SWENSON,

                Defendant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:17-cv-00123-MR-DLH)

Argued:  April 30, 2020                Decided:  August 26, 2020

Before GREGORY, Chief Judge, and DIAZ and THACKER, Circuit Judges.

Vacated and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Chief Judge Gregory and Judge Thacker joined.

---

**ARGUED:** Julie H. Fosbinder, FOSBINDER LAW OFFICE, Charlotte, North Carolina, for Appellant. Charles Evans Johnson, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Amanda Pickens Nitto, Angelique R. Vincent-Hamacher, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina; R. Scott Hudson, GREENE LAW OFFICES, PLLC, Lincolnton, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

In this appeal, Robert Gary claims that Facebook declined to promote him because he's black. Gary argues that this decision violated 42 U.S.C. § 1981, and that the district court's grant of summary judgment in favor of Facebook on this claim was in error. In particular, Gary contends that the circumstances surrounding Facebook's failure to promote him created an inference of discrimination and that Facebook's proffered explanation for that decision was pretextual. Because a reasonable jury could agree with Gary, we vacate the district court's order and remand for further proceedings.

I.

This appeal arises from a motion for summary judgment, and so we recite the facts with all reasonable inferences drawn in favor of the non-movant, Gary. *See Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 210–11 (4th Cir. 2016).

A.

Robert Louis Gary is a black man who began working at a Facebook data center in North Carolina about ten years ago. Initially, Gary worked for a contractor hired to build the Facebook facility, which is located in Forest City. Thereafter, Facebook hired Gary as a Critical Facilities Technician,[1] a role that involves operating and maintaining the data center premises. The job requires experience "in diverse industries such as electrical generation, electrical distribution, cooling technologies and fire suppression systems." J.A.

---

[1] The role is now referred to as Critical Facilities Engineer.

3

568. Once hired, responsibilities include performing "routine maintenance tasks" and safety inspections, as well as "[w]ork[ing] with vendors and contractors to ensure their work meets [F]acebook standards." *Id.*

A Critical Facilities Technician's performance is formally reviewed twice a year. As part of that process, the employee conducts a self-assessment and receives feedback from his or her manager and peers. That feedback is then collected and analyzed by the employee's manager, who recommends a performance rating on a seven-level scale ranging from "Does Not Meet Expectations" to "Redefines Expectations." J.A. 214. The employee's manager also recommends whether the employee should be promoted or given a raise.

Performance reviews are subjected to a calibration process on both a local facility and company-wide level. Facility-wide calibration involves a meeting between the Facilities Operations Manager, the Chief Building Engineers, and a Facebook Human Resources ("HR") Business Partner. Company-wide calibration involves a meeting between Facebook's Chief Building Engineers, Facilities Operations Managers, and regional directors. At the end of this process, Facebook makes final decisions regarding the employee's performance review and promotion, and then issues each employee a Performance Cycle Summary Letter. That letter summarizes the employee's performance review score and, where applicable, information regarding the employee's new salary, bonus payments, and award of Facebook equity grants.

At the heart of this appeal is the review of Gary's work in the latter half of 2013, which determined what (if any) raise, bonus, and promotion he might receive in the first

4

financial quarter of 2014 (the "2014 Q1 review"). At the time, Gary had been working as an entry-level Critical Facilities Technician for over a year. Per company practice, Facebook assigned Gary an "individual contributor" level.[2] Because Gary was entry level, his contributor level was denoted "IC1" (individual contributor level of one). The 2014 Q1 review determined, among other things, whether Gary would be promoted to the next contributor level of IC2 and receive a corresponding raise.

In the six months preceding the review, Gary worked the night shift at the facility. The night shift role had been pitched to Gary as a promotion by Wayne Hawkins, a white man who oversaw the Forest City operations team as Facilities Operations Manager. On the night shift, Gary worked alone and was thus solely responsible for the center. Gary was supervised in this role by another white man named Matt Hamrick. Hamrick reported to Hawkins.

To conduct the 2014 Q1 review, Facebook convened a committee comprised of Hamrick (Gary's supervisor), Hawkins (Facilities Operation Manager) and several other high-level managers. One of those high-level managers was James Faccone, the Facebook Global Facility Manager responsible for the Forest City center. Of the committee members, only Hamrick and Hawkins had worked with Gary during the relevant time

---

[2] Critical Facilities Technicians are assigned an individual contributor level based on the quality of their work. An employee is considered for promotion to the next contributor level, with a maximum level of five, once he or she "has consistently demonstrated the skills necessary to succeed at the higher level." J.A. 201. Facebook's Compensation Department then considers the employee's individual contributor level when setting his or her salary.

5

period. Hamrick, for his part, prepared a wholly positive written evaluation of Gary for the review, noting that Gary "need[ed] to be tasked with more project work" because he "wants to make a difference and make the job easier for his fellow employees." J.A. 1316. Hamrick didn't, however, assign Gary any recommended IC level. Hawkins's review, meanwhile, stated that Gary needed to be more of a "self starter" to merit a promotion. J.A. 1288.

Ultimately, the committee decided against promoting Gary and, instead, promoted several white Critical Facilities Technicians. Additional details of what occurred at the 2014 Q1 review are in dispute. In deposition, Faccone testified that Gary was slotted for promotion until Facebook's headquarters instructed him to shorten the list. Hawkins testified that he didn't recall Gary being on any list, but he did recall that Gary was "trending towards promotion" at the time. J.A. 388. The extent of Hawkins's control over the decision is also contested, although it's undisputed that his role was at least "significant." Oral Arg. at 26:36. Hamrick testified that he asked Hawkins "why [they] couldn't move forward with a promotion" for Gary and "was told that there wasn't enough impact." J.A. 1108. Faccone, for his part, stated that his role in the committee "was to instigate the thinking process" and "account for an equal evaluation for every employee." J.A. 1199.

Following the meeting, Gary received a letter indicating that he received a mid-level rating of "meets all expectations," would remain at the IC1 level, and would receive a modest raise. J.A. 967.

6

Over the next few months, Gary met with Hamrick three times to discuss why he wasn't promoted.[3] Following the first meeting, during which Hamrick provided Gary no meaningful explanation, Gary discovered that his white coworker, Greg Randall, had been promoted and received a considerably higher raise. This promotion was surprising to Gary because Randall had started his job as a Critical Facilities Technician less than one year prior to his review. According to both Gary and Hawkins, receiving a promotion after such a short performance period was contrary to the company's typical practice. Further, Gary had trained Randall and observed that Randall struggled to perform basic troubleshooting tasks and write emails. Hamrick (Randall's manager) also testified to Randall's lack of communication skills.

After learning of Randall's promotion, Gary had a second meeting with Hamrick to discuss the discrepancy. At that meeting, Hamrick "didn't want to talk too much about [Randall's] performance," J.A. 827, and "still didn't really have a major explanation" for the decision, J.A. 826. Hamrick was apologetic about the outcome, however, and acknowledged that Gary had been "overlooked." *Id.* When pressed, Hamrick mentioned— for the first time—that Gary's "communication maybe wasn't there." J.A. 827.

Hamrick then scheduled a third meeting with Gary, but this time included Hawkins as an attendee. Gary requested that the meeting also include Robert Duffy, a black man who was then an assistant manager at the facility and was once a plaintiff to this lawsuit.

---

[3] The description of these meetings is primarily derived from statements made by Gary during his deposition and Facebook's internal investigation.

At that meeting, Gary claimed that the only reason Randall received a promotion instead of Gary was because of race. Hawkins replied that he wasn't a racist, that he had mixed-race children, and that Gary didn't receive the promotion because his communication skills were lacking. At the end of the meeting, Gary stated that he was going to file an HR complaint. Hawkins stated that the complaint would likely get him fired and told Gary, "I hope you feel sorry for me." J.A. 555.

The next day, Gary submitted a complaint to Facebook's HR department alleging that the promotion decisions constituted race discrimination. In the complaint, Gary alleged that Hawkins had made the comment, "[T]hey better just be happy they have a good job," in reference to the facility's black employees. J.A. 160. Gary concluded, "I hope you can look into this ASAP. I believe the reason I have been treated this way is because I'm African American, and they never expected for me to say anything." *Id*.

Facebook assigned Sandi Marciari to investigate Gary's complaint. As part of her investigation, Marciari interviewed Gary, Faccone, Hamrick, Hawkins, and Duffy. Faccone, Hamrick, and Hawkins each told Marciari that Gary wasn't promoted because, in contrast to Randall, Gary wasn't a strong communicator and lacked initiative. Meanwhile, Gary acknowledged that Hamrick had told him that he wasn't promoted because he needed to take more initiative, send more emails, and get more involved in special projects. But Gary insisted that this was nonsense and that his race was the only explanation.

Ultimately, Marciari concluded that race played no role in the decision not to promote Gary. Rather, Marciari concluded that Randall was promoted instead of Gary because Gary wasn't a "self-starter" and lacked "effective communication skills." J.A.

8

235–36. When Gary learned of Marciari's decision, he believed that he was "out of options" and "had to just keep moving forward." J.A. 130. Approximately two months later, following his next biannual review, Gary was promoted to IC2 and received a corresponding raise.

About one year later, Gary obtained a statement prepared by his white coworker, Brian Gill, alleging that Hawkins had made several racist comments. Among them, Hawkins had allegedly called Gary a "lazy n[****]r that wants everything handed to him," and referred to Gary's black coworker using the same term. J.A. 538. Elsewhere, the statement asserts that Hawkins made racist remarks regarding another black employee's banana allergy. Facebook investigated these allegations, found them to be true, and fired Hawkins. As a sign of good will, Facebook paid Gary the raise that he would have received had he been promoted after the 2014 Q1 review.[4] Gary has since been promoted again and received additional raises. He continues to work at the Forest City data center.

B.

After learning of Hawkins's racist statements, Gary sought and received a right-to-sue letter from the Equal Employment Opportunity Commission. Gary then filed suit against Facebook and Hawkins alleging, among other things, that Facebook's failure to

---

[4] Gary's lawsuit seeks declaratory relief, punitive damages, and compensatory damages resulting from emotional distress.

9

promote him following the 2014 Q1 review amounted to race discrimination, in violation of 42 U.S.C. § 1981.[5]

The parties proceeded to discovery and, thereafter, Facebook moved for summary judgment, arguing that Gary failed to establish (1) a prima facie case that Facebook engaged in race discrimination and (2) that Facebook's legitimate explanation for the decision was pretextual.

The district court granted Facebook's motion. First, the district court found that Gary's white coworkers (including Randall) were too dissimilar to give rise to an inference that their promotion over Gary constituted race discrimination. Second, the district court determined that even assuming an inference of discrimination arose, it was nonetheless rebutted by Facebook's explanation that Gary wasn't promoted because he lacked initiative and communication skills.

Gary timely appealed.

## II.

We review the district court's grant of summary judgment de novo. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment requires us

---

[5] Gary initially named another Facebook employee, James Swenson, as a defendant in this case, but he has since voluntarily dismissed Swenson.

to conclude that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.

### A.

This action arises under 42 U.S.C. § 1981, which guarantees "[a]ll persons . . . the same right . . . to make and enforce contracts." 42 U.S.C. § 1981(a). Section 1981 dates back to the Civil Rights Act of 1866, which was passed in the aftermath of the Civil War to protect the rights of black citizens. To that end, § 1981 creates, among other things, a cause of action for individuals aggrieved by race discrimination at the hands of their private employers. *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975).

Where, as here, the § 1981 plaintiff doesn't allege direct evidence of discrimination, we apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework was initially developed for Title VII discrimination cases, but it has since been applied to cases arising under § 1981. *See, e.g.*, *Guessous*, 828 F.3d at 216.

We note at the outset that our application of *McDonnell Douglas* here is consistent with the Supreme Court's recent decision in *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009 (2020). There, the Court held that a § 1981 plaintiff must prove that race was a but-for cause of the plaintiff's injury and, by the same token, rejected the plaintiff's counterargument that *McDonnell Douglas* established a contrary "motivating factor" causation test. *See id.* at 1019. "Whether or not *McDonnell Douglas*

11

has some useful role in § 1981 cases," the Court declared, "it does not mention the motivating factor test" or "address causation standards." *Id.* Rather, the Court characterized its decision in *McDonnell Douglas* as "a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof discrimination." *Id.* We find ourselves confronting such a claim here and, as such, continue to apply *McDonnell Douglas*.

Under the *McDonnell Douglas* approach, the plaintiff must show that he or she (1) is a member of a protected class who (2) applied for a position, (3) was qualified for that position, and (4) was rejected "under circumstances giving rise to an inference of unlawful discrimination." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 544–45 (4th Cir. 2003) (cleaned up).

If the plaintiff makes that initial showing, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse decision. *Id.* at 545. If the defendant offers such a reason, the burden then returns to the plaintiff to "prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and the true reason is discriminatory or retaliatory." *Guessous*, 828 F.3d at 216.

B.

Here, Gary plainly satisfies the first three conditions of the prima facie test under *McDonnell Douglas*: (1) he's a black man, and thus a member of a protected class; (2) who was considered for a promotion; and (3) was qualified for that promotion. Facebook argues that Gary fails to satisfy the fourth condition of his initial burden, however, which requires him to show that the circumstances surrounding the adverse decision create an inference

12

of discrimination. Gary attempts to make this showing by comparing his treatment to that of a similarly situated white coworker, or a "comparator" (in this case, Randall). According to Facebook, this attempt fails because no rational factfinder could find that Randall is, in fact, a proper comparator.

Under *McDonnell Douglas*, an inference of discrimination arises from evidence that the employer favored a white comparator over the plaintiff. *See Bryant*, 333 F.3d at 545–46. To qualify as a comparator, there must be "enough common features between the individuals to allow for a meaningful comparison." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007); *accord Haywood v. Locke*, 387 F. App'x 355, 359–60 (4th Cir. 2010) (unpublished). Of course, a meaningful comparison can be made without "precise equivalence" between the two employees. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1107 (4th Cir. 1985) (cleaned up) (addressing a discriminatory discipline claim); *see also Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993) (noting, in that same context, "that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances"). Typically, a comparator and the plaintiff have "dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes*, 922 F.3d at 223–24 (cleaned up).

C.

Gary argues that a reasonable juror could find that his white coworker, Randall, is his comparator.[6] We agree. The evidence reflects that Gary and Randall were both entry-level Critical Facility Technicians, were both supervised by Hamrick, were both working in the same Forest City facility, and were both considered for a promotion from IC1 to IC2 during the 2014 Q1 review. Surely, a reasonable juror could find that Facebook's treatment of these two men permits meaningful comparison.

Facebook contends that no reasonable juror could compare Facebook's treatment of Randall to that of Gary because Randall was a better employee. This argument is misplaced. If Randall were a better employee, then Facebook had a legitimate, non-discriminatory reason for promoting Randall but not Gary, thus rebutting an inference of discrimination. But this result would be the *consequence* of comparing Facebook's treatment of Randall and Gary, not a reason to forego such a comparison. In other words, Facebook's argument conflates its burden to rebut Gary's prima facie case with Gary's burden to make that case in the first instance. Accordingly, we reject it.

D.

Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant "to produce evidence that the plaintiff was rejected, or someone else was

---

[6] Gary alternatively argues that another white employee, Kevin Walker, is his comparator. Walker and Gary, however, were not similarly situated. The two men worked in different buildings, reported to different supervisors, and had significantly different work histories (including, in Walker's case, prior work experience at Facebook).

preferred, for a legitimate, nondiscriminatory reason." *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001) (cleaned up). If the defendant provides such a reason, the burden reverts to the plaintiff to establish that the reason is pretextual. *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 258 (4th Cir. 2006). A failure-to-promote plaintiff can establish pretext by "amassing circumstantial evidence that . . . undermines the credibility of the employer's stated reasons," or "by showing that he was better qualified" than a comparator. *Id.* at 259.

Here, Facebook attempts to rebut Gary's prima facie case by claiming that it didn't promote Gary because he exhibited little initiative and lacked communication skills, whereas Randall excelled in these areas. As these are legitimate reasons not to have promoted Gary, the burden returns to him to establish that they're pretextual. Gary attempts to carry this burden by "amassing circumstantial evidence" undermining Facebook's stated reason and by "showing that he was better qualified" for the promotion than Randall. *See id.* Construing (as we must) the facts in Gary's favor, we conclude that a reasonable jury could find either attempt successful.

1.

First, a reasonable jury may well conclude that the decision not to promote Gary was made by Hawkins. Facebook concedes that Hawkins's role in the decision was "significant," Oral Arg. at 26:36, but falls back on the presence of a committee in making the decision. But the evidence shows that the committee's decision-making process was led (if not completely controlled) by Hawkins. After all, documentation of Gary's promotion decision (or lack thereof) was prepared and signed by Hawkins. And only two

15

people on the committee—Hamrick and Hawkins—had experience working with Gary during the relevant time period. Of them, Hamrick reported to Hawkins, and appeared to have sought a promotion for Gary until the idea was rejected by Hawkins.

Hawkins's decisive role in the decision provides convincing evidence for Gary's case, as Facebook does not (and could not) contest that Hawkins was a racist. In his initial complaint to HR, Gary asserted that Hawkins said that the black employees "better just be happy they have a good job." J.A. 160. Hawkins was later fired following allegations that he called black employees (including Gary) by the term "n[****]r," referred to Gary's black coworker as a "monkey," J.A. 538, and made several other reprehensible remarks.

And troublingly, Hawkins's racist remark that Gary was a "lazy n[****]r that wants everything handed to him," J.A. 538, resembles—in despicably graphic terms—comments Hawkins made on Gary's performance evaluation. In particular, Hawkins commented that "in order to achieve the next level Robert [Gary] will need to be more of a self starter," J.A. 1288, a comment that Facebook now relies upon for its position that Gary wasn't promoted because of an alleged lack of initiative. Thus, even if Hawkins didn't *singlehandedly* make the promotion decision, a reasonable jury could conclude that Hawkins's racism is what caused the committee, which was comprised of Hawkins's subordinates and high-level managers, not to promote Gary.

2.

Second, a reasonable jury could find that Gary was, in fact, more qualified than Randall for the promotion. Going into the 2014 Q1 review, Gary was excelling in his role as a Critical Facilities Technician. In an employee evaluation, Hamrick described Gary's

16

work during the relevant time period as "great," "pivotal," and having "saved [the] team and company great expense and anguish." J.A. 1316. Indeed, in a portion of the form requesting constructive feedback, Hamrick stated that Gary should be "tasked with more project work" because he "wants his impact to be felt[,] . . . to make a difference[,] and [to] make the job easier for his fellow employees." *Id.*

Additionally, Gary had more experience in the role than Randall. Randall had been in the role less than a year before being promoted, despite Hawkins's testimony that "[m]ost of the time" employees "had to perform in 12-month increments before they would be recommended for a promotion." J.A. 1150. By contrast, Gary had been in the role for over a year, not to mention the additional two years he had spent building the Facebook facility as a contractor. What's more, Gary helped *train* Randall when Randall joined the Facebook team.

Facebook argues that, regardless, Randall was promoted because he had the communication skills and initiative that Gary lacked. But the facts underlying this contention are mixed. Granted, Randall received positive feedback for these skills in performance evaluations that predate Gary's complaint.[7] But the record also contains evidence that Randall, in fact, struggled in both departments. Gary testified that, when training Randall, he noticed that Randall had difficulties with composing emails and using

---

[7] We note that Gary would not have had much opportunity to display his communication skills after he moved to the night shift, which required him to work alone and accept full responsibility over the facility. Notably, Gary accepted this role at Hawkins's request. Indeed, Gary testified that Hawkins convinced him to work the night shift by conveying that after six months on that schedule, he'd be "going to IC2." J.A. 831.

17

proper grammar. Hamrick, too, testified that Randall "lack[ed] certain communication skills" and "used poor grammar." J.A. 1089.

Evidence as to Randall's initiative is similarly mixed. Hamrick testified that Randall "was very busy around the facility," J.A. 166, and "was in the mix," J.A. 168. █

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

And finally, as reflected above, a substantial basis for Facebook's claim that Randall was a better employee comes from deposition testimony taken after this lawsuit was filed. *See EEOC*, 243 F.3d at 853 ("a factfinder could infer from the late appearance of [an employer's] current justification that it is a post-hoc rationale, not a legitimate explanation for [its] decision"). Of course, a jury may nonetheless credit such evidence to conclude that Facebook promoted Randall over Gary for reasons other than race. But Gary has amassed enough evidence to convince a reasonable jury otherwise. Accordingly, summary judgment is improper.

IV.

For the reasons given, we vacate the judgment of the district court and remand for further proceedings consistent with this decision.

*VACATED AND REMANDED*

18