**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1055**

MONICA GUESSOUS,

Plaintiff - Appellant,

v.

FAIRVIEW PROPERTY INVESTMENTS, LLC,

Defendant - Appellee.

-----------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:14-cv-00224-GBL-IDD)

Argued: December 9, 2015                    Decided: July 6, 2016

Before TRAXLER, Chief Judge, and GREGORY and DIAZ, Circuit Judges.

Vacated and remanded by published opinion. Judge Gregory wrote the opinion, in which Chief Judge Traxler and Judge Diaz joined.

**ARGUED:** Arinderjit Dhali, DHALI PLLC, Washington, D.C., for Appellant. Hans Paul Riede, ODIN, FELDMAN & PITTLEMAN, P.C., Reston, Virginia, for Appellee. Gail S. Coleman, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for

Amicus Curiae. **ON BRIEF:** Lauren Friend McKelvey, ODIN, FELDMAN & PITTLEMAN, P.C., Reston, Virginia, for Appellee. P. David Lopez, General Counsel, Jennifer S. Goldstein, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Office of General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

_____

GREGORY, Circuit Judge:

On February 28, 2014, Monica Guessous filed suit against Fairview Property Investments, LLC ("Fairview"). She alleged six claims in her complaint: pursuant to 42 U.S.C. § 1981, Guessous asserted claims for race discrimination ("Count I"), hostile work environment ("Count II"), and retaliation ("Count III"); and pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., she asserted claims for discrimination based on religion, national origin, and pregnancy ("Count IV"), hostile work environment ("Count V"), and retaliation ("Count VI"). On December 16, 2014, the district court granted summary judgment for Fairview on all six counts. For the reasons that follow, we vacate the order granting summary judgment on all counts and remand for further proceedings.

I.

We recite the facts drawing reasonable inferences in favor of the non-movant, Monica Guessous. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A.

Fairview manages several real estate properties and engages in real estate leases and sales. Guessous is an Arab-American Muslim woman from Morocco who worked for Fairview from February

3

2007 until March 2013 when she was terminated from her position as a bookkeeping assistant. She was terminated by her direct supervisor, Greg Washenko, who became Fairview's Chief Financial Officer ("CFO") in October 2008. Prior to Washenko's arrival, Guessous had been supervised by Peter Arey who was Fairview's Vice President at that time.

In deposition testimony, Guessous recounted numerous allegations of mistreatment by Washenko during the final four-and-a-half years of her employment at Fairview.[1] Guessous and Washenko met for the first time at a meet-and-greet event held in October 2008, shortly after Washenko was hired. At that first meeting, Washenko asked Guessous where she was from and, when she replied that she was Middle Eastern, he said that in a previous job he had worked with "a bunch of Middle Easterners and they are a bunch of crooks, [who] will stop at nothing to screw you." J.A. 207-08.[2] From that point forward, Washenko exhibited a habit of discussing Moroccans, Muslims, and Middle Easterners in disparaging and offensive ways. For example, in January 2010, after reading news reports about Islamic

---

[1] Unless noted otherwise, quotations of conversations between Guessous and Washenko come from Guessous' testimony. They are not direct quotes from Washenko, but Guessous' recreation of those past statements.

[2] References to "J.A." refer to the Joint Appendix submitted by the parties to this appeal.

terrorism, Washenko came out of his office and walked to Guessous' desk to ask her, "Why do Muslims hate America?" J.A. 216. Guessous replied that she was Muslim and did not hate America. She further stated that "Muslims are not terrorists," to which Washenko responded, "Yeah, sure. Like my buddy says . . . not all Muslims are terrorists, but most are." J.A. 216. Guessous testified that Washenko's body language during that conversation made her feel "cornered" and "intimidated," in particular because he stood over her while she sat at her desk.

On another occasion in May 2010,[3] following a series of Hamas attacks on Israel, Washenko again left his office to approach Guessous. When he said, "I need your intake on this," Guessous believed he was bringing her something to work on. Instead, Washenko proceeded to tell her, "I could never understand this whole suicide bomber thing. . . . These poor Israelis are being bombed every day by Muslim Palestinian terrorists." J.A. 217. Guessous attempted to explain that "[s]uicide is prohibited in the Koran" and that it "specifically says that it does not condone killing innocents." J.A. 217. She also told him she was not Palestinian and that she "ha[d] no

---

[3] The district court appears to have committed a typographical error in citing this event as occurring in May 2012. Guessous v. Fairview Prop. Investments, LLC, No. 1:14-CV-00224-GBLIDD, 2014 WL 7238993, at *3 (E.D. Va. Dec. 16, 2014). Deposition testimony and Guessous' complaint both indicate that it occurred in 2010.

5

business speaking about" the issue. J.A. 217. On yet another occasion, in February 2011 during the Arab Spring, Washenko again left his office to approach Guessous at her desk and ask, "What's up with Egypt and why are the Muslims killing people?" J.A. 239. Guessous testified that by this time she had become frustrated with these kinds of inquiries and tried to explain to him that she was not Egyptian and had no particular insight into the uprising.

In fact, Washenko consistently conflated Guessous' identity as a Moroccan Muslim with other Middle Eastern identities, blurring the lines between race, ethnicity, national origin, and religion. For example, in late 2011, Guessous was called to the basement of one of Fairview's buildings where a restaurant was located. She was then asked to act as a translator for one of the restaurant's employees who was a Farsi-speaking Persian Iranian. When Guessous told Washenko that she did not speak Farsi, he replied, "'So you don't speak Iranian? Shouldn't there be some secret [] language that you all understand?'" Guessous v. Fairview Prop. Investments, LLC, No. 1:14-CV-00224-GBLIDD, 2014 WL 7238993, at *5 (E.D. Va. Dec. 16, 2014).[4]

---

[4] The word "Muslim" has been excised from our quotation where indicated. Although the district court relied on Guessous' own complaint, in her deposition testimony she did not include the word "Muslim" in her quotation of Washenko. J.A. 246.

Washenko continued to direct these kinds of inquiries at Guessous throughout 2011. In August or September of that year, as Muamar Gaddafi's rule in Libya was coming to an end, Washenko asked Guessous to explain the situation in that country to him. Again, she responded that she was not Libyan and did not have an interest in events going on there. Around this time, Guessous sent an email to her brother-in-law, a police officer, explaining some of the issues she was having with Washenko and asking for his advice. Among other complaints, she said,

> I am sick and tired of been the 411 for issues relating to a Muslim terrorist and or a Islamic country's national conflicts and or cultural issues or weirdness that he is trying to find out about. I feel targeted for my believes and my ethnicity and culture and for all the year I have been in the good all united stated of America I have never felt so inferior to anyone as I am feeling at this point.

J.A. 329 (errors in original).

But being dragged into uncomfortable, and often offensive, discussions on current events was hardly the only behavior to which Guessous objected. Much of Washenko's conduct was more personal in nature. For example, beginning in early 2010, Washenko spent several months referring to Guessous by her Moroccan name, "Mounia," instead of her chosen Americanized name, "Monica." Guessous, 2014 WL 7238993, at *3. While Fairview asserts that Washenko desisted at Guessous' request, Guessous herself stated in the same 2011 email to her brother-

7

in-law that she had "struggled for quite some time to have him call me Monica instead of Mounia," J.A. 328, and noted in her complaint that Washenko only stopped "[a]fter 2-3 months of repeated requests and protests," J.A. 16. In September of that same year, Guessous wished Washenko a happy birthday, which happens to fall on September 11th. Washenko responded to his sole Muslim Arab employee's well wishes by saying that each year on his birthday he was "reminded of the terrorist attacks by the Muslims" and then walking out of his office. J.A. 235.

Another of their conversations in 2010 turned personal after Washenko initiated a discussion on the differences between Christianity and Islam. First, Washenko asked Guessous to describe Islam to him, and in turn he described Christianity to her. Guessous then began to explain that Judaism, Christianity, and Islam are all Abrahamic religions, that their adherents worship the same God, and that Islam treats Jesus as a prophet who was raised to Heaven by God and who will return to Earth. Although initially uncomfortable with the conversation, as she explained Islam to Washenko, emphasizing the similarities between their faiths, Guessous testified that she began to feel "happy because I was like I'm doing something good." J.A. 225. But Washenko was apparently incensed at the suggestion, saying, "'No Monica! We are not the same, you might think we are, but we are not! We do not believe in the same God!' and then

storm[ing] away." Guessous, 2014 WL 7238993, at *3. Guessous was hurt by the reaction, recalling in testimony that the statement, "We're not the same . . . . made me feel like I'm not even a human being." J.A. 226.

Washenko's personal and offensive comments continued into 2011 and 2012. In the fall of 2011, Washenko was shopping for a new car for his son. Guessous suggested he purchase a Volkswagen because her mother drove one and it had been reliable. Washenko replied, "[T]hat car must have taken a lot of beating from a Moroccan driver." J.A. 246. Guessous testified that she was deeply offended and "couldn't believe . . . he [was] insulting my own mother." J.A. 246. Also in late 2011, Washenko engaged in an extended prank, telling staff members over the course of two weeks that Guessous had tried to poison him. In fact, Guessous had shared some Taco Bell with Washenko at lunch one day, and that evening Washenko had gone to the emergency room with abdominal pain. Although he was unable to get a diagnosis at the hospital, Washenko told Guessous, and apparently others, that the doctor had asked him who gave him the food, that Washenko had replied "my Muslim employee," and that the doctor then responded, "Well she's obviously trying to poison you or kill you." J.A. 249. Watching Washenko tell the story repeatedly around the office, Guessous said she "just felt like a terrorist." J.A. 249-50.

9

One of the most offensive episodes began differently than most of the encounters described in Guessous' testimony. While these conversations were typically initiated by Washenko, in this case Guessous decided to try to "educate" her boss about her culture in order to frame it in a more positive light. In late 2011 or early 2012, Guessous was sent photos from a friend who had moved to Dubai. When she received the pictures of the clean and modern city she wanted to show Washenko the images to demonstrate "we're not a bunch of like morons or idiots." J.A. 247. Rather than being impressed as Guessous had hoped, Washenko told her that he had a friend who lived in Dubai for a year and had hated the experience, and that this friend had told him, "Despite all the buildings and modern [sic], they are just a bunch of camel people." J.A. 247.

Most of Guessous' remaining allegations concern what she characterized in her complaint and testimony as Washenko's intrusive and overbearing approach to managing her as his subordinate employee. After assuming the position of CFO, Washenko monitored Guessos directly. Guessous testified that Washenko would often leave his office to stand behind her desk and inquire what she was working on. These inquiries were repeated as many as forty times in a single day. Guessous felt that Washenko would sometimes badger her in this manner, wait for her to become irritated or overwhelmed, and then accuse her

10

of being overly upset. On at least one occasion, Washenko followed Guessous into the copy room, asked her what she was working on in there, and then told her, "I'm watching you." J.A. 215-16. This conduct was specifically aimed at Guessous and not at other employees. In fact, other employees joked about how, even when Washenko was out of the office, he would constantly call Guessous to ask her what she was doing and to tell her not to leave early.

Washenko once asked Guessous just five minutes after she'd been given an assignment whether it was done. When she said it was not, Washenko looked at his watch, snapped his fingers, and said, "[T]his is not Morrocan time." J.A. 238. This close supervision, combined with the troubling statements Washenko had made about Muslims', Arabs', and Moroccans' trustworthiness and work ethic, made Guessous feel "like maybe I'm a crook. Like he made me rethink myself. . . . So now I felt like he is not seeing me as me and what I can bring to the table and my work. Now he labeled me as this Middle Easterner." J.A. 212.

In the winter of late 2011 or early 2012, another incident occurred which reinforced this link in Guessous' mind. Washenko called Guessous into his office in what she described as a secretive manner, asking her to close the door behind her. He proceeded to tell Guessous that Rashid Lakroun, a Moroccan restaurant manager in one of Farivew's buildings, had been

11

fired.  Guessous was confused as to why she would be informed since she was not involved with the restaurant and had only seen Lakroun occasionally when he came into Fairview's offices.  As she expressed this confusion, Washenko told her, "I just thought you should know since you are both Moroccan," adding, "He's a very bad guy, Monica . . . .  Monica, Monica, [h]e's a very bad guy."  J.A. 250–51.  This conversation left Guessous feeling targeted, and she testified that "after I got fired, when I left, I felt like I was [Lakroun].  Because now [Washenko]'s probably calling somebody in his office telling them that I was bad."  J.A. 251.

B.

In late 2011, Guessous became pregnant.  During most of 2012, Washenko's comments about Arabs and Muslims apparently slowed.  Guessous attributed this to her own conduct—she said she avoided engaging with him in order to reduce stress during her pregnancy.  In July 2012, Guessous requested a three month maternity leave.  She stated in her complaint that Washenko felt this was excessive and that she had to inform him that she was legally entitled to twelve weeks off.  Guessous was on leave from August 2012 until October 2012.  When she returned she said Washenko largely ignored her, keeping all of her old work duties assigned to other staff members whom Guessous described in her complaint as "two non-Muslim, non-Arab, Christian American

12

females, who also did not seek maternity leave." Guessous, 2014 WL 7238993, at *6.

On December 6, 2012, Guessous initiated a conversation with Washenko in which she asked for her old duties back, to be trained for additional duties if needed, and also confronted Washenko about his past discriminatory and offensive conduct. Guessous testified that she told Washenko that, as a new mom, she did not want the stress she had endured in the past. Approximately seventy-five minutes after that conversation ended, Mary Alexander, Fairview's president, sent two emails to other employers not associated with Fairview. The subject lines of the emails read "Hiring?" and Alexander asked whether either of these employers had any openings for "a wonderful girl that works for me that we simply do not have enough work for right now." J.A. 325-27.

Three months later, on March 1, 2013, Washenko terminated Guessous. Guessous was asked to sign a severance agreement that would have waived her employment law rights, but she refused. There is a dispute about whether Washenko initially cited a change in Fairview's financial situation or a lack of work for Guessous' position. Guessous, 2014 WL 7238993, at *7. Fairview alleges that the issue of insufficient work for Guessous' position was discussed periodically over approximately two years prior to her termination. But Fairview avers that the decision

13

to terminate Guessous was made by Washenko in "late November or early December 2012 . . . and that [the] decision was approved by Ms. Alexander." J.A. 339. In other words, Fairview admits the decision was made by Washenko at or around the time that Guessous confronted him about withholding her job duties and treating her poorly prior to her pregnancy.

Guessous' position was not filled by any new hire. Instead, Fairview shifted her work duties to two staff members, Kara Diaz and Tara Berger; an outside contractor, Kurt Johnson; and to Washenko himself. Johnson is an accountant who owns his own business and serves multiple clients. He testified, however, that he is in the Fairview office three to four days each week and that he spent even more time there in the past. Ms. Diaz and Ms. Berger are both administrative assistants.

Guessous filed a discrimination charge with the EEOC on March 5, 2013, just a few days after her termination. She filed her civil complaint approximately one year later on February 28, 2014. Guessous' claims were divided into six counts. Counts I, II, and III asserted race discrimination, hostile work environment, and retaliation respectively under § 1981. Counts IV, V, and VI, also asserted discrimination, hostile work environment, and retaliation, but based on religion, national origin, and pregnancy as covered under Title VII.

14

On December 16, 2014, the district court granted Fairview's motion for summary judgment on all counts. The court first noted that Guessous "failed to comply with Local Rule 56(B) in her Opposition to Defendant's Motion for Summary Judgement" by citing to her own complaint and by failing to cite certain factual allegations at all rather than pointing to evidence in the record to show a dispute of material fact. Guessous, 2014 WL 7238993, at *10. The court "refuse[d] to consider Plaintiff's self-serving statements as evidence to create a dispute of material fact" on these issues. Id. The court went on to note that it would be proper to "consider[] the defendant's facts as undisputed for purposes of the motion" and evaluate the motion as such. Id. However, the court decided to "nevertheless proceed to assess the merits of Plaintiff's claims." Id.

The district court held that Counts I, III, IV, and VI (the discrimination and retaliation claims under both statutes) failed because Fairview had met its burden to produce a non-discriminatory reason (lack of work) for its underlying conduct (terminating Guessous), and Guessous had not demonstrated a genuine issue of material fact to show that this reason was a pretext. As to Count II, the court concluded that only one of Washenko's statements "can be construed as a racially derogatory comment," id. at *11, and held this was insufficient to

15

establish a hostile work environment.  Finally, as to Count V, the court found that the last act contributing to the alleged hostile work environment occurred more than 300 days before Guessous filed a complaint with the EEOC and that this claim was therefore time-barred.  Id. at *18.

Guessous timely appealed.


II.

All issues in this appeal arise from an order of summary judgment and are reviewed de novo.  Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009).  Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial.  Liberty Lobby, 477 U.S. at 248-49. The nonmoving party must do so by offering "sufficient proof in the form of admissible evidence" rather than relying solely on the allegations of her pleadings.  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

The court must "view the evidence in the light most favorable to the [nonmoving] party."  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (internal quotation omitted).  "The court . . . cannot weigh the evidence or make credibility

16

determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568-69 (4th Cir. 2015). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

## III.

The district court granted summary judgment for Fairview on the discrimination claims (Counts I and IV) and retaliation claims (Counts III and VI) under both § 1981 and Title VII by applying the McDonnell Douglas burden-shifting framework. This framework was initially developed for Title VII discrimination cases, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), but has since been held to apply in discrimination cases arising under § 1981, Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989); Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 257 (4th Cir. 2001), and in retaliation cases under both statutes, Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997) (addressing Title VII retaliation claim); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 n.1 (4th Cir. 2000) (addressing § 1981 retaliation claim). The framework applies in employment discrimination and retaliation cases where a plaintiff does not present sufficient direct or circumstantial evidence showing

17

that an adverse employment action was motivated by intentional discrimination aimed at the plaintiff's protected characteristic(s). Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015). This is such a case.

The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56 (1981); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (holding that the employer's burden in step two is one of production, not persuasion). For status-based discrimination claims, the employee must "show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2523 (2013). Retaliation claims, by contrast, require the employee to show "that retaliation was a but-for cause of a challenged adverse employment action." Foster, 787 F.3d at 252;

18

see Nassar, 133 S. Ct. at 2533 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). The Supreme Court has recently reiterated that a cause need not work in isolation to be a but-for cause. Burrage v. United States, 134 S. Ct. 881, 888 (2014) ("Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived."). As the district court noted, the plaintiff's burden to show pretext "merges with the plaintiff's ultimate burden of persuading the court that she was a victim of intentional discrimination." Guessous, 2014 WL 7238993, at *9 (citing Burdine, 450 U.S. at 256).

## A.

The facts and reasoning supporting our decision on Guessous' retaliation claims are also essential for analyzing her discrimination claims. As such, we address the retaliation claims first. In Count III, Guessous alleges that her conversation with Washenko in December 2012 (in which she asked for her old duties back and confronted Washenko about past

19

hostile and discriminatory conduct) constituted protected activity under § 1981. She further alleges that Fairview retaliated against her for engaging in that conduct by deciding within seventy-five minutes to terminate her, as evidenced by the emails sent by Alexander to two outside employers inquiring whether they might hire her away from Fairview. In Count VI, Guessous makes essentially the same allegations but seeks relief under Title VII. Since the elements of these retaliation claims are identical, Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004), and because the district court granted summary judgment on both for effectively the same reasons, we review them together.

To establish a prima facie case of retaliation under either statute, Guessous must show "(i) that [she] engaged in protected activity, (ii) that [her employer] took adverse action against [her], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." Foster, 787 F.3d at 250 (alteration in original) (quoting Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004)) (quotation marks omitted). The district court held these elements were met. Under the McDonnell Douglas framework, establishing a prima facie case shifted the burden to Fairview to produce a legitimate, non-discriminatory reason for the adverse employment action. Fairview alleged that Guessous was terminated because

20

there was insufficient work to support her position.  The burden then shifted back to Guessous to show this reason was a pretext to disguise the true retaliatory reason for her termination.

The sole issue on appeal, therefore, is whether Guessous met her summary judgment burden of demonstrating a genuine dispute of material fact on the question of pretext sufficient to make Fairview's proffered justification a triable issue. Foster, 787 F.3d at 254; see also King v. Rumsfeld, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting) ("To survive summary judgment, however, King need not squarely rebut his employer's explanation.  Instead, King must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing.").

Rather than engaging in a detailed analysis of the competing evidence proffered by Fairview to support its lack-of-work theory, and by Guessous to support her retaliation theory, the district court granted summary judgment for Fairview for one reason:  that Guessous' position remained unfilled.  Guessous, 2014 WL 7238993, at *15.  The court offered no elaboration in its opinion, but its logic appears to have been that, because the work was absorbed by Fairview's other employees, Guessous cannot show that there was enough work to justify keeping her on staff and she therefore cannot prevail.  If that is, indeed, the

court's reasoning it is a fallacy: because Fairview has shown it <u>could</u> operate without Guessous does not mean that it <u>would</u> have done so absent the protected activity. Guessous' burden is only to show that the protected activity was a but-for cause of her termination, not that it was the sole cause. <u>Foster</u>, 787 F.3d at 252; <u>see also</u> <u>Montell v. Diversified Clinical Servs., Inc.</u>, 757 F.3d 497, 507 (6th Cir. 2014) ("[I]n retaliation cases, courts must determine 'what made [the employer] fire [the employee] <u>when it did</u>.'" (emphasis and alteration in original) (quoting <u>Hamilton v. Gen. Elec. Co.</u>, 556 F.3d 428, 436 (6th Cir. 2009))).

The district court and Fairview are both correct that Guessous failed to show there was so much work to be done that the bookkeeping assistant's position was an absolute necessity. The position was not back filled and Guessous acknowledged in her testimony that she was not always busy. A reasonable jury could easily conclude, however, that the termination decision was made only seventy-five minutes after Guessous' complained to Washenko about past comments and treatment, and that it was therefore motivated by the complaint itself. <u>See</u> <u>Okoli v. City of Baltimore</u>, 648 F.3d 216, 223 (4th Cir. 2011) (holding that the "deeply suspicious [fact] that Stewart fired Okoli only hours after she . . . complain[ed] to the Mayor" about

22

harassment was sufficient to meet plaintiff's burden to show pretext at the summary judgment stage).

The December 6, 2012, emails from Alexander are substantial evidence in support of Guessous' argument that when she complained to her supervisor, who was also her alleged harasser, Washenko decided to terminate her and immediately got the decision approved by Alexander. Fairview counters that Alexander did not know about the confrontation. This argument has two problems. First, Guessous has presented evidence that a co-worker brought the confrontation to Alexander's attention while it was ongoing because Washenko had made Guessous cry. This alone would be enough to allow a reasonable jury to conclude Alexander knew about the complaint and that the termination decision was made in response. Second, Fairview has admitted that the decision to fire Guessous was made by Washenko in "late November or early December 2012 . . . and that [the] decision was approved by Ms. Alexander." J.A. 339. This admission is consistent with Guessous' claim that the termination decision was made on December 6, 2012, that Alexander was involved, and that the termination was retaliatory.

The absence of any evidence to support Fairview's lack-of-work explanation is also important. Although Fairview claims that Washenko and Alexander had discussed eliminating Guessous'

23

position in the past, there is no record evidence to support that claim—no emails, no meeting minutes, no performance reviews, nothing. The only thing Fairview even points to as evidence is the pair of December 6, 2012, emails from Alexander. Fairview points out that they explicitly say there was not enough work for Guessous. But the fact that these emails came on the heels of the protected activity in this case suggest that the reason given in the emails was a pretextual one. Even if a jury accepted Fairview's argument that it did not need an assistant bookkeeper, based on the record evidence it could still conclude that the protected activity was the final straw that motivated Guessous' termination. See Burrage, 134 S. Ct. at 888. Because Guessous' evidence puts the validity of Fairview's explanation in doubt, it is sufficient to survive summary judgment. See Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006) (holding a plaintiff will not survive summary judgment by "focusing on minor discrepancies that do not cast doubt on the explanation's validity"); King, 328 F.3d at 154 (Gregory, J., dissenting) ("Because he has made out a prima facie case, if King also has cast doubt upon the real motivations behind his unique treatment, he has adduced sufficient evidence to survive summary judgment.").

We therefore reverse the district court and vacate the order of summary judgment with respect to Counts III and VI.

24

B.

In Count I of her complaint, Guessous alleges that Fairview treated her differently based on her race, ultimately terminating her and giving her work duties to several non-Arab employees in violation of § 1981. In Count IV, she makes the same allegations except that she asserts the discriminatory conduct was based on her religion, national origin, and pregnancy as covered under Title VII. As the elements of these discrimination claims are effectively the same and the district court granted summary judgment on both for effectively the same reasons, we review them together.

In a typical discriminatory discharge case, the plaintiff establishes a prima facie case by showing "(1) that [s]he is a member of a protected class; (2) that [s]he suffered from an adverse employment action; (3) that . . . [s]he was performing at a level that met [her] employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class." King, 328 F.3d at 149. As we have explained, however, the prima facie requirements are not set in stone, and "differing factual circumstances may require adaptation." Duke v. Uniroyal Inc., 928 F.2d 1413, 1417 (4th Cir. 1991). An adaptation of the prima facie case is required here, because this is not a typical discriminatory discharge case, where a putatively poor-performing employee is

25

terminated and replaced by someone outside the protected class. Because Fairview claims it terminated Guessous because it lacked enough work for a full-time bookkeeping position, this case is closer to a reduction-in-force case, where unnecessary positions are eliminated, than it is to a typical discharge case. Accordingly, adapting the final prima facie requirement to the facts of this case means that Guessous was required to show that her job duties were absorbed by employees not in the protected class or otherwise show that Fairview did not treat Guessous' protected characteristics neutrally when deciding to terminate her. See id.; Merillat v. Metal Spinners, Inc., 470 F.3d 685, 690 n.1 (7th Cir. 2006) (explaining that in a "mini-RIF" case, which involves the elimination of only one position, "[t]he retention of an employee outside the protected class to perform the plaintiff's duties is nothing more than a demonstration of more favorable treatment, particularly tailored to the factual circumstances of a mini-RIF case."). Given the undisputed evidence that Guessous' duties were absorbed by non-Arab, non-Muslim employees, Guessous has established a prima facie case of discriminatory discharge. The question, then, is whether Guessous met her summary judgment burden of demonstrating a genuine dispute of material fact on the question of pretext sufficient to make Fairview's proffered justification a triable issue. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d

310, 319 (4th Cir. 2005). The district court recognized that Guessous offered three arguments, supported by the record, to rebut the proffered justification as pretextual: "(1) the decision to terminate her was finalized seventy-five minutes after she engaged in protected activity, (2) no one else was terminated for the reasons provided by Defendant, and (3) she was terminated by her aggressor." Guessous, 2014 WL 7238993, at *11. But the court concluded that "[n]one of these . . . could lead a reasonable jury to conclude by a preponderance of the evidence that . . . lack of work [] was not its true reason" for terminating Guessous. Id. The court did not offer further reasoning in support of this legal conclusion.

As with the retaliation claims, the court observed that Guessous' position was not filled after her termination. Id. As noted above, however, this is not a typical discharge case, so the fact that Guessous was not replaced by a new hire does not prevent Guessous from establishing pretext and thus is not fatal to her claim. Whether or how this played into the court's analysis, however, is unclear because replacement by a person outside the protected class is a prima facie element of a discrimination claim. King, 328 F.3d at 149. The district court explicitly found that Guessous had established a prima facie case, so to the extent it relied on the fact that the position was never filled to conclude she had not met her

27

burden, the court's opinion appears to be internally inconsistent. Nor is there anything in the McDonnell Douglas burden-shifting framework that says "a plaintiff must always introduce additional, independent evidence of discrimination." Reeves, 530 U.S. at 149. To the extent that the evidence supporting a plaintiff's prima facie case also undermines the employer's non-retaliatory justification, that evidence may be called upon by the trier of fact in determining whether or not the proffered justification is pretextual. Id. at 143. It is therefore not clear why the court felt Guessous's evidence of discriminatory purpose was outweighed by Fairview's evidence that it had not hired a replacement.

For largely the same reasons discussed in connection with Guessous' retaliation claims, the evidence in the record is sufficient to permit a reasonable jury to conclude that Fairview's lack-of-work claim is a pretext for discrimination. Fairview contends that it had been considering the elimination of Guessous' position for two to three years before she was terminated, but there is no evidence in the record documenting the existence of a years-long evaluation of the need for Guessous' position. While Fairview contends the "wonderful girl" emails sent by Alexander on December 6, 2012, confirm the lack of work, a jury would be entitled to take those emails at less than face-value, given that they were sent so soon on the

28

heels of Guessous' conversation with Washenko about his treatment of her, a conversation about which Alexander had contemporaneous knowledge. Moreover, the record evidence shows that other employees—including those to whom Guessous' work was redistributed—were not busy and yet kept their jobs. J.A. 260-61 ("Kara . . . said to me, 'Oh, my god, Monica, I have nothing to do today.' . . . And [Kara's] like, 'I'm browsing Pinterest, I'm just pinning this, pinning this, pinning that.' And [Washenko] even confirmed it that Kara had nothing to do."). More to the point, all of the evidence of Washenko's disparaging remarks and statements that Muslims and Middle Easterners were "crooks" and untrustworthy support the allegation that the termination was a continuation of past discrimination, brought to a head by Guessous' complaint about that very discriminatory conduct. The record establishes a history of discomfort, distrust, and disparaging treatment directed at Guessous, and it demonstrates a discriminatory animus on the part of Washenko.

At oral argument, counsel for Fairview attempted to distinguish between what it admitted were Washenko's inappropriate comments and Guessous' allegation that the termination was motivated by animus. Oral Argument 25:00. But Guessous' burden is only to "produce sufficient evidence upon which one could find that 'the protected trait . . . actually motivated the employer's decision.'" Hill v. Lockheed Martin

29

Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir. 2004) (quoting Reeves, 530 U.S. at 141).  That counsel believes the statements were inappropriate but not indicative of animus is of no moment—a reasonable jury would certainly be entitled to reach a different conclusion.  As this is the extent of Guessous' burden at the summary judgment stage, we reverse the district court and vacate the order of summary judgment with respect to Counts I and IV.

IV.

In Count II, Guessous alleges she was subjected to a hostile work environment based on her race and seeks to recover under § 1981.  In Count V she makes the same allegation with respect to her religion, national origin, and pregnancy, seeking recovery under Title VII.  The elements of a hostile work environment claim "are the same under either § 1981 or Title VII."  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001).  To prevail on a hostile work environment claim, "a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'"

30

Okoli, 648 F.3d at 220 (quoting Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010)).

A.

Because Count V squarely presents a statute of limitations issue also implicating Count II, we address it first. The district court granted Fairview's motion for summary judgment on Count V, finding that Guessous' Title VII hostile work environment claim was time barred. To pursue a claim under Title VII, a Title VII Charge must be filed with the EEOC within a statutorily defined period of time of either 180 or 300 days. 42 U.S.C. § 2000e-5(e)(1); see also Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007). The district court found, and the parties agree, that the statutory period for this case is 300 days.

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" and the Supreme Court has held that such claims are subject to a "continuing violation" theory[5]: "In

---

[5] To be precise, the Supreme Court rejected the "continuing violation" doctrine then followed in the Ninth Circuit, which held a defendant could be liable for discrete discriminatory acts that were otherwise time barred if those acts were related to subsequent violations falling within the statutory period. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). However, it adopted such a doctrine with respect to hostile work environment claims, and this and other courts have referred to this doctrine as a "continuing violation" approach. E.g., (Continued)

31

determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,'" and "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116-17 (2002) (emphasis added). In other words, even if most of the harassing conduct on which a plaintiff relies to establish her hostile work environment claim occurred outside the statutory period, the claim will be considered timely if at least one act continuing the violation occurred within the statutory period. Furthermore, the plaintiff may recover for all of the harm resulting from the hostile work environment, not just those contributing acts that occurred during the statutory period. Id. at 119 ("If Congress intended to limit liability to conduct occurring in the period within which the party must file the charge, it seems unlikely that Congress would have allowed recovery for two years of backpay.").

---

Gilliam v. S.C. Dep't Of Juvenile Justice, 474 F.3d 134, 140 (4th Cir. 2007) ("The Supreme Court, however, in its Morgan decision in 2002, explained the standards for applying the continuing violation doctrine-undermining our earlier authority on this point-and instructed that evidence of behavior occurring outside of the applicable limitations period can be used to support a plaintiff's hostile work environment claim.").

The discriminatory and retaliatory termination claims (Counts IV and VI) survived the limitations inquiry because each of those counts was predicated on the termination itself, which occurred on March 1, 2013, just days before Guessous filed her charge with the EEOC. Guessous argued to the district court that the termination was also a constituent act contributing to the hostile work environment and that Count V was therefore also timely. Alternatively, Guessous argued that Washenko's decision to remove her assignments from her in November 2012 after she returned from maternity leave was a constituent act supporting the hostile work environment claim and also occurred within the statutory period.

The district court held that "[d]iscrete acts includ[ing], inter alia, termination, failure to promote, denial of transfer and refusal to hire," as well as removing work assignments, are "different from the hostile work environment claims" and that, because such discrete acts are separately actionable, they cannot comprise part of a hostile work environment claim. Guessous, 2014 WL 7238993, at *17. That holding was in error.

In Morgan, the Supreme Court held that a time-barred discrete act claim remains time-barred even if it is part of a series of related actions, some of which occurred during the limitations period. See id. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are

33

related to acts alleged in timely filed charges."). Morgan thus establishes that the continuing-violation doctrine cannot be used to pursue claims challenging time-barred discrete acts.

That, however, is not the issue in this case, as Guessous does not rely on the continuing-violation doctrine to revive time-barred discrete acts. Indeed, there are no time-barred discrete acts here—the discrete acts about which Guessous complains occurred only a few months before she filed her EEOC charge. Instead, the issue in this case is whether non-time-barred discrete acts can be considered part of the "series of separate acts that collectively" create a hostile work environment, id. at 117, thus rendering a hostile-environment claim timely under the continuing-violation doctrine.

The Supreme Court has recently explained that in a constructive-discharge case, the employee's resignation is the culmination of the intolerable discriminatory conduct of the employer, such that the relevant limitation period starts with the employee's resignation, not the last act of the employer. See Green v. Brennan, 2016 WL 2945236 at *6 (U.S. May 23, 2016). If a constructive discharge can be part and parcel of a discriminatory pattern of conduct, we see no reason that a discrete act cannot. So long as the act is part of the pattern of discriminatory treatment against the employee, then that act should be sufficient for purposes of the continuing-violation

34

doctrine, even if the act would otherwise qualify as a discrete act that is independently actionable.

In Green, the Supreme Court also clarified the holding in Morgan to be that a hostile-environment claim "includes every act composing that claim, whether those acts are independently actionable or not." 2016 WL 2945236 at *6 (emphasis added). It pointed out that "even if a claim of discrimination based on a single discriminatory act is time barred, that same act could still be used as part of the basis for a hostile-work-environment claim, so long as one other act that was part of that same hostile-work-environment claim occurred within the limitations period." Id. at *9 n.7 (emphasis added) (citing Morgan, 536 U.S. at 117). As such, the district court's conclusion that neither the withdrawal of work from Guessous nor her termination were facts that could support her Title VII hostile work environment claim was erroneous. Because the work assignments were withdrawn in November 2012, and the termination occurred in March 2013, both constitute facts within the statutory period which contributed to the hostile work environment and make that claim timely.

### B.

With respect to Count II, the district court granted summary judgment for Fairview, holding that only one of Washenko's comments was racially derogatory, that this was the

35

only unwelcome conduct alleged to be based on Guessous' race, and that this was insufficiently severe or pervasive conduct to support a hostile work environment claim under § 1981.

Hostile work environment claims under § 1981 are subject to a four year limitation period. White v. BFI Waste Servs., LLC, 375 F.3d 288, 291-92 (4th Cir. 2004). Because Guessous filed her complaint in the district court on February 28, 2014, "unwelcome conduct" occurring on or after February 28, 2010, falls within the statutory period. As already discussed, however, hostile work environment claims under Title VII are also subject to the "continuing violation" theory for establishing limitations periods which can make the defendant liable for conduct occurring prior to the statutory period as well. As there was relevant conduct that occurred before February 28, 2010, this Court must decide whether the same continuing violation theory applies in § 1981 cases.

Four of our sister circuit courts of appeal have addressed this issue, and all four have held that the Morgan continuing violation approach applies to § 1981 hostile work environment claims just as it does to such claims under Title VII. Tademy v. Union Pac. Corp., 614 F.3d 1132, 1153-54 (10th Cir. 2008); Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 270 (7th Cir. 2004); Madison v. IBP, Inc., 330 F.3d 1051, 1061 (8th Cir. 2003); Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th

36

Cir. 2002). In Morgan, the Supreme Court characterized hostile work environment claims as addressing "a single unlawful employment practice," rendering the constituent acts forming that practice effectively indivisible. 536 U.S. at 115, 117. Our sister circuits have viewed this as a simplification of the law, e.g., Shields, 305 F.3d at 1282, allowing the courts to view a hostile work environment claim holistically in the same way that discrete act claims are normally treated. This is consistent with the Supreme Court's analysis explicitly contrasting the simple task of identifying a discrete act "such as termination, failure to promote," etc., with the murkier task of pinning down hostile work environment claims that by "[t]heir very nature involve[] repeated conduct." Morgan, 536 U.S. at 114-15. That problem is as present in § 1981 claims as it is in Title VII claims, and the Morgan Court's solution is therefore equally applicable. Applying the continuing violation approach to § 1981 claims would also extend this Court's policy of treating Title VII and § 1981 hostile work environment claims the same. Spriggs, 242 F.3d at 184. As such, we hold that Morgan applies with equal force when such claims arise under § 1981.

We now turn to the merits of the race-based hostile work environment claim. We first note that application of Morgan to the facts of this case results in all of the alleged conduct

37

being relevant to our inquiry.  The district court held that the first element for a successful claim was met as the alleged conduct was, indeed, unwelcome.  It granted summary judgment for Fairview, however, based on a combination of the second and third elements of the claim—that the conduct be based on the plaintiff's race and be severe or pervasive.  First, the court held that Washenko's statement calling the people of Dubai "camel people" was the only one that could be characterized as racially derogatory.  Second, it determined that this one comment was insufficient to cause a reasonable person to believe "the environment [was] objectively hostile or abusive."  EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 318 (4th Cir. 2008).

Two aspects of the district court's decision were in error: with respect to the second step of the analysis, the district court took an overly cramped view of what constitutes race-based conduct; with respect to the third step, the court failed to consider the totality of circumstances, as it must when determining whether unwelcome conduct is severe or pervasive. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015).

Turning first to the district court's approach to race, the Supreme Court has held that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry

38

or ethnic characteristics." Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987). Where the conduct at issue is "based on the fact that [the plaintiff] was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981." Id. Based on legislative history, the Court further noted that many of the "races" which members of Congress perceived to be covered by § 1981 comprised ancestrally related peoples more easily identifiable by their cultural affinities than their physiognomic characteristics.[6] Id. at 612 (noting references to "Scandinavian races," "the Chinese," "Latin," "Spanish," Anglo-Saxon races," "Jews," "Mexicans," "blacks," "Mongolians," "Gypsies," and "the German race"). In fact, the Court went so far as to say "that a distinctive physiognomy is not essential to qualify for § 1981 protection." Id. at 613.

Guessous' assertion is that her Arab ethnicity[7] motivated Washenko's conduct, or at least enough of his conduct to

---

[6] In fact, the word "race" does not appear in § 1981 at all, although the statute has long been construed as barring racial discrimination in public and private contracts. Runyon v. McCrary, 427 U.S. 160, 168-69 (1976).

[7] Although "Arab" is usually considered a cultural rather than racial designation, the Supreme Court has specifically held that it is a cognizable protected class under § 1981. Saint Francis Coll., 481 U.S. at 613; see also id. at 610 n.4 (discussing Arab peoples as members of the Caucasoid race, as (Continued)

39

constitute intolerable working conditions.  Viewed through the lens just established, it is not at all clear how the district court concluded that "camel people" was racially derogatory, but all[8] "of Washenko's [other] statements toward [Guessous], while distasteful, were references to and questions about Islam and Moroccan culture" and not her Arab ethnicity.  Guessous, 2014 WL 7238993, at *13.  To begin, the comments were more than distasteful, and it is beyond euphemistic to characterize them as references and inquiries.  More to the point, many of these comments were either clearly or conceivably racial.

During their very first interaction, Washenko told Guessous that "Middle Easterners . . . are a bunch of crooks, [who] will stop at nothing to screw you."  J.A. 207-08.  A broad comment like this one, aimed at no particular religion or nationality, could certainly be construed as racially motivated.  That comment also set the stage for Guessous' and Washenko's working relationship from that point forward.  In late 2011, Washenko assumed that Guessous, an Arab from Morocco, would be able to

_____

well as the limitations of a purely scientific approach to such determinations).

[8] The district court used the word "most" rather than "all" as we use here.  We make this substitution based on the district court's holding that only one of Washenko's many statements was racially hostile.  By implication, the court must have concluded that none of the rest of his comments was racial in nature.

40

interpret for a Persian Iranian restaurant employee who did not speak English. When Guessous told him the employee spoke Farsi and she did not, Washenko said "shouldn't there be some sort of secret language you all understand?" J.A. 246. A jury could easily conclude that "you all" referred to a racial category, that it was a reference to Middle Eastern people, and that Washenko perceived Arabs and Persians to be members of the same race (or was entirely unaware of any distinction at all). Even his comment that Muslims and Christians do not worship "the same God," while clearly motivated in large part by a religious animus, could be construed as taking on racial overtones when Washenko followed up by saying, "We are not the same." J.A. 225-26. The manner in which Washenko delivered this statement left Guessous feeling less than human, a hallmark of racially insensitive conduct.

The district court put itself in the place of the jury when it decided that only one of the remarks was racial. The court said the remaining comments "were references to and questions about Islam and Moroccan culture," but a jury might well decide they were also motivated by broader ethnic animus. See Saint Francis Coll., 481 U.S. at 613 (holding that discrimination "based on the fact that [plaintiff] was born an Arab, rather than solely on the place or nation of his origin" will support a § 1981 claim (emphasis added)). After all, Washenko regularly

41

interchanged his harassment of Guessous, referring to Muslims, Morrocans, Palestinians, Egyptians, Middle Easterners, and North Africans. A jury could reasonably conclude that Washenko bore animus towards all Middle Eastern people (other than Israelis whom Washenko referred to as the victims of Palestinian attacks); that Guessous reasonably perceived many of these comments as racial insofar as Washenko considered most Middle Easterners and Middle Eastern Muslims to be "crooks" or "terrorists"; and therefore that Washenko harassed Guessous based on her Arab ethnicity even when his comments referred to other, related aspects of her identity. In reaching this conclusion, we do not endorse Guessous' argument that a § 1981 claim may be pursued on the theory that all aspects of her identity form "an amorphous whole," making Fairview liable under that statute for non-race-based harassment.[9] We hold only that it would be possible for a jury to interpret many of Washenko's comments as based on race in addition to other forms of animus.

---

[9] Such a theory may be available under Title VII to the extent that it covers multiple elements of identity, including religion and national origin, not covered by § 1981. This Court has not decided whether such "hybrid" claims may be maintained, and has no occasion to do so here, but several of our sister circuits have agreed that, under Title VII, "where two bases for discrimination exist, they cannot be neatly reduced to distinct components." Lam v. Univ. of Hawai'i, 40 F.3d 1551, 1562 (9th Cir. 1994).

42

Finally, on the question of whether the conduct was severe or pervasive, the district court erred by failing to take into account the totality of the circumstances as we have held it must do at this stage of the analysis. Spriggs, 242 F.3d at 184. The "severe or pervasive" question is subject to the same standard under § 1981 that applies to Title VII. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII [and therefore § 1981] is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations and quotation marks omitted).

Because its analysis of what constitutes a racially derogatory comment was flawed, as just discussed, much more conduct should have been reviewed by the court in addressing this question. As the district court noted, we have found conduct sufficiently severe or pervasive where an Iranian employee was called "the local terrorist, a camel jockey, and the Emir of Waldorf" repeatedly throughout the duration of his

43

employment. Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (quotation marks omitted). But the district court attempted to distinguish Amirmokri from this case, noting that there the plaintiff developed an ulcer and resigned. Guessous, 2014 WL 7238993, at *12. There is, of course, no requirement that the plaintiff develop physical symptoms, nor that she leave her job, to prove sufficiently severe or pervasive harassment. See Forklift, 510 U.S. at 21–22. The question is whether Guessous reasonably perceived "the work environment to be abusive." Amirmokri, 60 F.3d at 1131. The conduct overlooked by the district court demonstrated a greater "frequency of the discriminatory conduct," some of the episodes were more "sever[e]" than the single "camel people" comment, and there was substantial testimony that the discrimination "unreasonably interfere[d] with [Guessous'] work performance." Forklift, 510 U.S. at 23. There was also evidence—in the form of Guessous' email to her brother-in-law and testimony that she often left the office to cry and that she was concerned about how the stress from her work environment might affect her pregnancy—that Guessous' "psychological well-being" was at risk, which "is, of course, relevant to determining whether the plaintiff actually found the environment abusive." Id.

44

Moreover, the court did not look at the evidence of Washenko's intimidating and intrusive management of Guessous or that behavior's relationship to his race-based statement that "Middle Easterners . . . are a bunch of crooks." J.A. 207-08. Guessous testified that she felt demeaned by Washenko's intrusive management of her (and her alone), the intimidating way he would stand over her during confrontational conversations, and the underlying assumption that she was not to be trusted. The evidence suggests Washenko thought Guessous was untrustworthy—and intended to make that clear to her—from the moment she disclosed her origins to him at their initial meeting. A jury would certainly be entitled to reach that conclusion. We have long held that "whether harassment was sufficiently severe or pervasive is quintessentially a question of fact," Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 208 (4th Cir. 2014) (citations and quotation marks omitted), and here Guessous has presented diverse evidence sufficient to create a material dispute as to the severity of the unwelcome conduct.

By failing to address numerous comments that were open to a racially motivated interpretation, and by circumscribing its analysis to just one comment without reviewing the totality of the circumstances, the district court committed reversible error

45

in its grant of summary judgment for Fairview.  As to Count II we reverse.

V.

Based on the foregoing, we vacate the order of summary judgment on all claims and remand for further proceedings.

<u>VACATED AND REMANDED</u>